IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BETTY SUE BRANSON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:13-CV-866-O |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Betty Sue Branson, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director of TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

**I. BACKGROUND**

On June 12, 2009, in the 371st District Court of Tarrant County, Texas, a jury found Petitioner guilty of attempted capital murder by arson and arson and assessed her punishment at twelve years' confinement for each offense. Adm. R., Js. of Conviction by a Jury, 281-84, ECF No. 13-21. The Second Court of Appeals of Texas summarized the evidence as follows:

   **1. The State's Case**

   Branson lived in a mobile home park in Haltom City next to Cheryl Dalton and across from Dalton's daughter Heather. Betty and Lloyd Bright, Mark and Brenda Phillips, Karen Long, and Branson's mother all lived on the same street. Buddy lived with Branson and her chihuahuas, Jack and Chrissy.

Cheryl and two of her daughters, Stormi (age twenty-four) and Jamey Jo (age twenty-nine), testified at trial. On the morning of August 24, 2008, Jamey Jo and Cheryl were leaving their home when they saw Branson and Buddy working in Branson's yard. Buddy gave Jamey Jo some cash to buy him some cigarettes. Cheryl said that Branson looked aggravated with Buddy for talking to Jamey Jo.

Branson, a medical assistant, went to work later that day. Jamey Jo saw Branson when Branson came home from work, and she heard Branson talking loudly as she unloaded dirt from her truck. Specifically, she heard Branson say she was "really pissed off" because Buddy had not finished the yard. Cheryl testified that she asked Branson whether she got her flowers planted, and Branson replied, "No, I fucking didn't." Branson returned shortly thereafter, apologized for being rude and, according to Jamey Jo, said, "I'm sorry. It's not y'all; it's him," and, according to Cheryl, "I'm not mad at you, I'm mad at him."

Later that evening, Stormi and Jamey Jo were home watching a movie when they heard banging outside and their dog started "going crazy," barking loudly. When they opened their front door, which faced Branson's trailer, they smelled and saw smoke and saw Branson in her nightgown, beating on her trailer's back door with something and screaming about her dogs being inside. Stormi and Jamey Jo went back inside their trailer, woke Cheryl, and told her that they thought Branson's house was on fire. Cheryl called 911. From her front porch, Cheryl could see and smell smoke. She asked Branson what was going on, and Branson replied, "My house is on fire." She asked Branson where Buddy was, and Branson replied, "He's in the fucking house, and I hope he dies. I hope the son of a bitch dies."

Branson's trailer's metal front door was open, but the screen door was closed, and Jamey Jo could not see inside. She ran to her father's truck, got a tire iron, ran back to Branson's trailer, and broke the front window. She saw Buddy on the floor, not moving, and flames inside the residence on the main wall, as well as a lot of smoke. Jamey Jo yelled for Buddy, but he did not move.

Lloyd Bright testified that he and his wife Betty had gone to bed when their dog started barking. He went to see what was going on and saw a couple of people screaming and running around between the Daltons' trailer and Branson's. When he and his wife went outside, they could hear fire engine sirens.

Haltom City Fire Department Lieutenant Greg Wagner testified that he was the first officer on the scene that night. He saw moderate smoke coming from the trailer's front door, and two women told him that there were three dogs in the trailer that needed to be rescued–the woman he identified as Branson was "very hysterical." He asked both women if anybody else was inside, but they did not respond. Firefighter Phillip Perdue, who was dressed in full gear and carrying the fire hose,

2

stated that he was detained by two women who tried to stand in his way. They did not move when he told them to. Lieutenant Wagner and Branson were exchanging words when he heard Firefighter Perdue say, "We found a victim." Firefighter Perdue rescued Buddy.

Firefighter Perdue described the interior as having visibility of two feet and being "really, really hot," and he described Buddy as unconscious and spitting up when he found him. While rescuing Buddy, he became tangled with a coffee table that was between Buddy's location on the floor and the front door. When he brought Buddy out, a female yelled, "Why didn't you leave him in there?"

By the time Lieutenant Wagner went inside the trailer, there was very little active flame and the north side wall was blackened. He did not know if the walls were actually on fire. There appeared to have been some fire suppression activities prior to the firefighters' arrival, including a garden hose through the front door that was still flowing.

Buddy and three dogs were treated with oxygen. Firefighter Sterling Gilliland testified that when he started treating Buddy, Buddy had a copious amount of mucus present in his mouth and airway and soot from the fire around his nose and mouth, which made him think that Buddy had smoke inhalation or airway injuries. When Buddy regained a semiconscious state, his breathing was irregular, labored, and rapid, and he fell into respiratory arrest for around a minute before beginning to breathe on his own again.

Paramedic Jennifer Craven, who arrived with the Medstar ambulance that night, stated that Firefighter Gilliland told her that Buddy was "found unconscious in his house, had to be carried out, wasn't breathing appropriately when they found him, and they had to assist his breathing until he became conscious again." Buddy was conscious when she spoke with him and had no obvious burns, but his moustache was singed, and she could smell burnt hair. The saliva on his face had soot in it, which indicated to her that smoke had been deep in his lungs, and she was concerned about the possibility that he had airway burns and swelling. He initially objected to being taken to any hospital and would only let her take him to the closest, North Hills Hospital.

While Lloyd and Betty Bright stood in their driveway, Branson walked over and sat down on the curb. Branson screamed for a cigarette, and Cheryl gave her one, hoping it would calm her down. Lloyd described Branson as "pretty angry and flailing her arms. She kept asking–just saying the same things about her dogs." Betty asked Branson who started the fire, and Branson replied, "I did. I wanted him dead, but I've killed my dogs. I've killed my dogs. I've killed my dogs." The chihuahuas, Jack and Chrissy, as well as Ladybug, Branson's mother's dog, were in

3

Branson's trailer on the evening of August 24, 2008, and all three dogs died that night.

Haltom City Police Officer Brandon St. John testified that he spoke with Buddy, Betty Bright, Mary Cole, and Branson that evening. Lloyd stated that when Officer St. John came over to the Brights' driveway and told Branson about her dogs, she went into a tirade. Officer St. John described Branson as

> very hysterical on [the] scene, very uncooperative. During the investigation, when I was speaking to her, it was very hard to talk to her. She kept referring to her dogs, asking about her dogs, during the course of me trying to gather information from her about what happened during the incident.

When he told Branson that she was not free to leave the scene, she stood up from the curb and began to walk off.

Officer St. John drew his taser, and Branson told him to go ahead and shoot her. When he armed the taser, she lifted up her nightgown, exposing herself. Officer St. John said that he did not have to use the taser on her and that he eventually calmed her down enough to arrest her based on the information he had gathered at the scene.

Jamey Jo said that Branson urinated on herself in the Brights' driveway. She described Branson as "going crazy over there, cussing . . . screaming a lot of stuff out," like that "[s]he didn't mean to kill her dogs, she wanted to kill Buddy, and she wanted to kill us and then herself. She didn't like us because everybody was talking about her and we're supposed to be her friends."

Haltom City Fire Department Deputy Chief Charles Napp, a fire marshal and master arson investigator, testified that what Captain Chilcutt described to him about the activities at the scene "more or less raised a red flag for [them] to look for certain things at the house." He said that there was very little structural damage and that it looked like there was more than one fire. He called for a dog and handler from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), took photos, and took samples from where the dog "hit." Chief Napp's samples included portions of the carpet and the coffee table; he also collected a foam pillow that was on the floor and an orange cigarette lighter.

Chief Napp found what he thought was a plastic gas can that had melted, and he stated that based on the evidence at the scene, the samples, and witness statements, he eliminated electrical causes and storms as the fire's cause. Because he did not find evidence of a smoldering cigarette in the sofa, which would also not

4

have accounted for the fire in the middle of the floor, the evidence "began to point to an intentionally set fire." Chief Napp described the three types of fire in the fire industry: arson, accidental, and undetermined, and he gave his opinion that this fire was not accidental or undetermined. A representative from the State Fire Marshal's Laboratory in Austin testified that he tested Chief Napp's samples and that gasoline was found on the foam pillow, the coffee table sample, the suspected gas can, and the carpet.

Buddy testified that he had known Branson for a year or two and that she let him move in with her. When Branson came home from work on August 24, she started drinking and went through a couple of bottles of white zinfandel. Branson was also taking Xanax. Buddy asked Branson's mother to come over and calm her down.

Branson broke some items in the house that night and then went outside and retrieved the red and black gas can that they used for the lawn mower and the weed eater. It was less than half full of gasoline. Branson turned the coffee table upside down and poured gasoline onto it. She kneeled down and used a lighter to light the fire, which spread to the carpet. Buddy opined that Branson was not trying to commit suicide.

Buddy and Branson were the only people in the trailer when it caught on fire. He tried to get her up from where she knelt and then went to get her mother. He also retrieved the fire extinguisher from the kitchen–he had to go through the fire to get it–but it ran out of foam. Buddy went outside, found the garden hose, and tried to put the fire out with it. He also tried to reach the dogs but was unable to get to them.

Buddy recalled being removed from the house and his treatment by the firefighters and paramedics, but he did not remember the ride to the hospital. He woke up in intensive care in the Parkland Burn Unit in Dallas, where he was told that his lungs "got a little burnt and stuff" and one of his tonsils was "messed up" and required surgery. He also testified that the fire melted his feet a bit. Parkland discharged Buddy the evening after the fire.

Buddy had been arrested prior to testifying. He admitted that he had told Branson's counsel the night before his testimony that "whoever gets me out [of jail] gets my vote," but he added, "I am certainly not going to lie to get out of jail."

Lieutenant Wagner, Captain Chilcutt, and Chief Napp testified that gasoline, if used to start a fire, is capable of causing death or serious bodily injury; Lieutenant Wagner added that a combustible or flammable liquid could do the same. Chief Napp testified that Haltom City was incorporated in 1960.

### 2. The Defense's Case

Dr. Jerry Davis, Branson's former employer, testified that Branson seemed very sad and distraught during the day on August 24, 2008, and she told him that she was feeling very sad and just wanted to run away from it all. He described the symptoms of major depression, stated that his assessment was that Branson had been suffering from a severe major depression, and stated that he had been in communication at the time with Branson's other doctors, including her treating psychiatrist.

Karen Long testified that Branson lived across from her and that on the night of the fire, Branson ran across the street, said her house was on fire, and asked Karen to call 911. Karen saw smoke and called 911. She asked Branson where the dogs were, and Branson said that they were not in their cages. Karen said, "I'm going after them," and headed to Branson's house.

Karen saw Buddy shaking the front door, trying to get in. He managed to get it open. Mary Cole, Branson's mother, joined Karen on the porch. Buddy had the hose and Mary helped him, trying to put the fire out. Karen tried to get in to get the dogs but was unable to because of the smoke. One of the firefighters asked Karen, "Is anybody in there?" She replied, "Sir, please get the dogs, but I don't think anybody's in there," because she thought Buddy was with them when they left the porch. She realized she was wrong when she saw them bring Buddy out.

Karen went home after she saw police handcuff Branson and put her in a police car. She saw Buddy two days later, and he asked her if he could move in with her. Karen stated that when Buddy asked if he could move in with her, he told her that he threw a cigarette into the gas and lit it.

Karen described Buddy as "a liar, con man, thief," and Cheryl Dalton as "a liar." Karen stated that Branson and Cheryl had been really good friends, but in the May or June before the fire, things began to get unfriendly, and the Daltons "aggravated [Branson] and stood out there in that yard and harassed her and screamed at her so much, it was just unreal, what they did."

Adm. R., Mem. Op., 6-16, ECF No. 15-4 (footnotes omitted).

Although Petitioner was convicted of attempted capital murder with a deadly weapon, a combustible or flammable liquid or gasoline, under Count One of the indictment, the trial court's judgment erroneously reflects that the jury answered "yes, *a firearm*" to the deadly weapon notice.

Adm. R., Writ, No. WR–80,130-01, 279-281, ECF No. 15-21 (emphasis added).

On appeal, at the parties' request, the Second Court vacated Petitioner's arson conviction and sentence and affirmed the trial's court judgment as modified. *Id.* at 2-4, 29. The Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. Adm. R., Docket Sheet-2nd COA, ECF No. 15-2. Petitioner also filed a state habeas application challenging her attempted capital murder conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. Adm. R., Writ No. WR-80,130-01, cover, ECF No. 15-19.[1] This petition for federal habeas relief followed.

## II. ISSUES

Generally, Petitioner raises the following grounds in her form petition:

(1) "Violation of federally protected rights;
(2) "5th Amendment violation to include wrongful conviction and false imprisonment;
(3) "Ineffective assistance of counsel and negligence (6th Amendment Right);
(4) "8th Amendment."

Pet. 6-7, ECF No. 1.

Petitioner provides no "supporting facts" for grounds one, three or four in the form petition. Instead, she merely directs the Court to "see supporting facts" as to grounds one and three and to "see Point IV argument" as to ground four. *Id.* at 6-7. Thus, the Court is left to surmise that Petitioner is raising the "Points" specified on added pages 12 and 13 of the petition, which do not include a "Point IV." *Id.* at 12-13.

Points I through III are stated in the petition as follows (all spelling, punctuation and

---

[1] Petitioner also filed a state habeas application challenging her arson conviction, however, as noted, that conviction and sentence was vacated.

grammatical errors are in the original):

> POINT I
>     Branson's Federally protected Right's were clearly violated; relying on the 14th Amendment to the U.S. Constitution; her right to Due Process has/is being violated in numerous ways, such as:
> FINDINGS
> 1.   Jury/charge: Pursuant to the judgment of Conviction by jury, Branson had been convicted and sentenced as well as confined since June 12, 2009 to date, with <u>NO EVIDENCE</u> whatsoever to obtain a legal conviction. The jury perjuded itself by stating they heard all the evidence . . . Ha the jury been instructed correctly, and not subjected to misleading and prejudicial statements by the prosecution, perhaps the jury would have found Betty Branson <u>NOT GUILTY</u> and would not have convicted and sentenced her for Attempted Capital Murder w/a FIREARM.
> 2.   Elements that are required pursuant to penal code §6.03 culpable mental state were not proven in order to obtain a conviction for Attempted Capital Murder w/a FIREARM.
> 3.   Appellant attorney nor the State filed a Motion for new trial after Court of Appeals VACATED the arson conviction and sentence.
> The Petitioner, Betty Branson, was formally and originally indicted for <u>ARSON</u>, deadly weapon – <u>Gasoline</u>. And indicted for <u>CAPITAL MURDER</u>; deadly weapon – <u>A COMBUSTIBLE or FLAMMABLE LIQUID</u>. No mention in <u>any</u> of the proceedings, evidence, media, or any other report including the indictment was a <u>FIREARM EVER MENTIONED</u>. Thus, Branson is wrongly convicted and falsely imprisoned.
>
> POINT II
> The petitioner, Branson, was convicted of a crime she was NEVER indicted for; a crime she NEVER committed. She is WRONGFULLY CONVICTED as #3 of point one outlines; and she is <u>FALSELY IMPRISONED</u> for not only a crime she was NEVER indicted for, But for a crime she <u>NEVER</u> committed. In fact, the indictment she was served and charged with stated, <u>ARSON W/DEADLY WEAPON/GASOLINE: AND ATTEMPTED CAPITAL MURDER W/DEADLY WEAPON/a COMBUSTIBLE or FLAMMABLE LIQUID</u> with an open flame <u>DURING the course of committing ARSON</u>.
> The Court of Criminal Appeals MODIFIED the trial courts decision (see Mandate), ordering the trial court to <u>VACATE the ARSON</u> conviction and sentence. Only to reflect the conviction and sentence for <u>ATTEMPTED</u> CAPITAL MURDER.
> FINDINGS
> 1.   The ARSON convictions and sentence was VACATED;
> 2.   On direct Reindictment she was charged with <u>CAPITAL MURDER during the course of committing ARSON w/deadly weapon; a combustible or a</u>

8

> flammable liquid;
> 3. The <u>ARSON conviction and sentence</u> was ORDERED modified and <u>VACATED</u>;
> 4. There are NO grounds for Branson to even be [FALSELY] imprisoned for <u>ATTEMPTED CAPITAL MURDER with a combustible or flammable liquid</u>; <u>DURING THE COURSE OF COMMITTING ARSON</u>; and differtally NO GROUND for ATTEMPTED or CAPITAL MURDER w/a FIREARM.
>
> POINT III
> The jury was tainted as Point one and two show; trial counsel did not prepare a proper or any defense for his client. Branson's desire to have Compulsory Process for obtaining witnesses/evidence in her favor was IGNORED by her counsel. Mr. Johnston obviously DID NOT inform Branson she was convicted of ATTEMPTED CAPITAL MURDER w/a FIREARM. Had Mr. Johnston, court appointed attorney, been effective and court appointed appellant attorney been effective they would have NOTICED and realized these facts. They would have noticed statements on the POLICE and MEDIA REPORT are inconsistant with testimony. Lary Lexington Johnston, himself, admitted in his affidavit that (the victim) George Svec LIED on the stand; and Johnston did NOTHING about it.

Pet. 12-13, ECF No. 1 (citations to the record omitted) (emphasis in original).

## III. RULE 5 STATEMENT

Respondent believes that the petition is neither barred by the statute of limitations nor successive. Resp't's Ans. 12-13, ECF No. 18. He does, however, assert that Petitioner's Points I and II and one of the claims in Point III are unexhausted and procedurally barred. Resp't's Answer 12-22, ECF No. 16.

## IV. EXHAUSTION OF STATE COURT REMEDIES

Applicants seeking habeas corpus relief under § 2254 are required to exhaust all claims in state court before requesting federal collateral relief. 28 U.S.C. § 2254(b)(1); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest court of the state. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-48 (1999); *Fisher*, 169 F.3d at 302; *Carter v. Estelle*, 677 F.2d 427, 443

9

(5th Cir. 1982). For purposes of exhaustion, the Texas Court of Criminal Appeals is the highest court in the state. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985). Thus, a Texas prisoner may generally satisfy the exhaustion requirement by presenting both the factual and legal substance of his claims to the Texas Court of Criminal Appeals in either a petition for discretionary review or a postconviction habeas corpus proceeding pursuant to article 11.07 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 (West Supp. 2013); *Anderson v. Johnson*, 338 F.3d 382, 388 n.22 (5th Cir. 2003). The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless,* 459 U.S. 4, 6-7 (1982); *Riley v. Cockrell,* 339 F.3d 308, 318 (5th Cir. 2003) ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."), *cert. denied,* 543 U.S. 1056 (2005); *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001) ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement").

Petitioner concedes that she presents Points I(a)-(c) and "Point II, Convicted for Attempted Capital Murder w/a/ firearm, but NEVER indicted for this particular offense," for the first time in this federal petition. Pet. 8, ECF No. 1. Petitioner's ineffective-assistance-of-counsel claim under Point III predicated upon the clerical error in the trial court's judgment and ground four in the form petition are also raised for the first time in this federal petition. Because these claims raise new factual and/or legal arguments for the first time in this federal proceeding, the claims are unexhausted. 28 U.S.C. § 2254(b). Under the Texas abuse-of-the-writ doctrine, however, Petitioner

cannot now return to state court for purposes of exhausting the claims. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4. The abuse-of-the-writ doctrine represents an adequate state procedural bar to federal habeas review. *Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir. 1997). Therefore, absent a showing of cause and prejudice or a miscarriage of justice, such showing not having been demonstrated by Petitioner, Points I, II, and III, in part, and ground four of the petition, raised for the first time in this federal proceeding, are procedurally barred from this Court's review. *Smith v. Johnson,* 216 F.3d 521, 523-24 (5th Cir. 2000). Accordingly, the following discussion is limited to Petitioner's remaining two ineffective-assistance claims under Point III.

V. DISCUSSION

    **A. Legal Standard for Granting Habeas-Corpus Relief**

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing

evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also entitled to the presumption of correctness. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

### B. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. Const. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

distorting effects of hindsight. *Id.* at 689. The Supreme Court recently emphasized in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective assistance of counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

362 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000) (emphasis in original)). Accordingly, it is necessary only to determine whether the state courts' adjudication of petitioner's ineffective assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

At trial, Petitioner was represented by Lex Johnston. Petitioner claims Johnston was ineffective by failing to prepare a defense and to call witnesses on her behalf. Pet. 13, ECF No. 1. As to the first claim, counsel testified, *via* affidavit, in the state habeas proceedings that he–

> came up with a trial strategy that was, in my opinion, the only logical way to defend the Petitioner in this matter an that was to attempt to show that it was possible that she was attempting to commit a suicide instead of attempting to kill George Svec. I believe that it was possible for a reasonable jury to have concluded, based upon the evidence, that this was, in fact, a suicide attempt and that George Svec was injured when he entered the fire and put himself in the dangerous situation.

Adm. R., Writ, WR-80,130-01, 107, ECF No. 15-19.

Counsel further testified regarding his decision not to call Petitioner's mother, Mary Cole,

as follows:

> As for the withheld testimony of Mary Cole, I did choose not to call her as a witness. I had thought about calling her as a witness, but believed that her testimony would be discounted by the jury because she is the mother of the Petitioner and that the jury would believe that she was lying on behalf of her daughter in order to get her out of trouble. I also chose not to call her as a witness because her testimony, based upon what she had told me during pre-trial interviews, would have contradicted the testimony of a seemingly unbiased witness, Karen Long, who I did call as a witness in the first phase of the trial. Also, I did not call her as a witness in the punishment phase because the Petitioner testified on her own behalf during that phase and I didn't feel that Ms. Cole would have any additional, relevant, information to provide and she had strong emotions about the verdict rendered by the jury and would have caused the jury to get the impression that they were a bunch of idiots for having found Petitioner guilty.

Adm. R., Writ No. WR-80,130-01, vol. 1, 103, ECF No. 15-19.

The state court entered findings consistent with counsel's testimony and concluded that counsel's decisions were the result of reasonable trial strategy; thus, applying *Strickland,* the court determined that Petitioner had failed to show ineffective assistance on counsel's part or a reasonable probability that but for counsel's acts or omissions the result of his trial would have been different. *Id.*, vol. 2, 272. In turn, the Texas Court of Criminal Appeals denied habeas relief on the trial court's findings.

The state courts' adjudication of the claims is not contrary to or involve an unreasonable application of *Strickland.* Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690-91; *St. Aubin v. Quarterman,* 470 F.3d 1096, 1102 (5th Cir. 2006), *cert. denied,* 550 U.S. 921 (2007). Counsel devised a viable defense, and Petitioner has failed to identify any other strategy that counsel could have adopted that would have reasonably resulted in a not-guilty verdict. Further, the presentation of witnesses is generally a matter of trial strategy. *Alexander v. McCotter,* 775 F.2d

595, 602 (5th Cir. 1985). Counsel is not required to call a witness whose testimony counsel believes will contradict the defensive strategy and/or be harmful to the defendant.

## VI. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 14th day of April, 2015.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**